IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

COREY TAYLOR,

                          Plaintiff,

     v.

LA CROSSE COUNTY and SGT. THOMPSON,

                          Defendants.

OPINION and ORDER

19-cv-678-jdp

---

Plaintiff Corey Taylor, appearing pro se, is currently incarcerated in the Missouri prison system. Taylor alleges that when he was incarcerated at the La Crosse County Jail, staff violated his rights by locking him out his cell and forcing him to sit on hard surfaces despite his painful internal hemorrhoids, and by blocking him from communicating with his grandmother. Defendants La Crosse County and Mike Thompson have filed two motions for summary judgment, one based on Taylor's failure to exhaust his administrative remedies on his claims about being locked out of his cell, Dkt. 28, and another based on the substance of his claims, Dkt. 48.

PRELIMINARY MATTERS

I begin with several motions filed by the parties.

After briefing was completed on defendants' exhaustion-based summary judgment motion, Taylor filed a document that he calls a "motion in suggestion—of defendant's summary judgment," Dkt. 41, and the parties briefed the substance of that motion. Taylor's motion is really one asking to file a sur-reply to defendants' exhaustion motion. This court generally disfavors sur-replies, but because Taylor is a pro se litigant and because the parties' briefing of

that motion clarifies their arguments, I will grant Taylor's motion and I will consider all of the parties' briefing on the exhaustion issue.

Taylor has filed two motions asking for the court to order Missouri prison officials to give him more law library time. Dkt. 36 and Dkt. 45. And he has filed a motion (his fourth) asking the court for assistance in recruiting him counsel. Dkt. 58. The Missouri officials aren't parties to this case or even part of the same corrections system as the defendants from La Crosse County. I would intervene in the administration of this unrelated prison system only in the rarest circumstance in which Taylor could show that prison officials were blocking his access to the court. But Taylor does not show that here; instead he vaguely alludes to needing law library time for the case, without explaining specific tasks he needs to accomplish. He has been able to file numerous documents in this court, including more than one round of briefing on defendants' exhaustion-based summary judgment motion. I'll deny his request for law library time.

Taylor's assertions about law library access are intertwined with his requests for recruitment of counsel. I denied his previous three motions for assistance in recruiting counsel in part because he failed to show that the case was too complex for him to handle. *See* Dkt. 19; Dkt. 27; Dkt. 34. That remains the case. Taylor says that he is unable to obtain video footage and other detainees' jail records, and that the case is more difficult for him because he is no longer at the jail but instead incarcerated in the Missouri prison system. But Taylor doesn't explain what steps he has taken to obtain discovery from defendants and he hasn't shown that this case depends on the materials that he seeks.

I note that Taylor did not file materials opposing defendants' motion for summary judgment on substantive grounds. But he doesn't specifically ask for counsel or for law library

time to prepare his summary judgment materials, and his other filings in this case show that he didn't need that help.  Defendants ask for all of their proposed findings of fact to be treated as undisputed, as the court warned in its preliminary pretrial conference materials. *See* Dkt. 24-1, at 8. But defendants have also submitted a copy of Taylor's deposition, Dkt. 53, so I will consider Taylor's sworn deposition testimony in addressing defendants' summary judgment motions. I will consider defendants' proposed findings that are supported by evidence and not contradicted by Taylor in his deposition to be undisputed.

My review of defendants' summary judgment materials and Taylor's version of the facts as detailed in his deposition show that this case is a relatively simple one boiling down to specific prison policies and events that Taylor was personally involved in. So there is no reason to recruit him counsel; I'll deny his renewed motion.

Defendants have filed a motion to compel Taylor to authorize release of his medical records pertaining to his claim that the symptoms from his internal hemorrhoids were exacerbated by him being forced to sit on hard surfaces while on lockout from his cell. Because I will be dismissing all of Taylor's claims, this issue is moot. I will deny defendants' motion.

## UNDISPUTED FACTS

I turn to defendants' summary judgment motions. Defendants have filed both an exhaustion-based motion and a substantive motion; I'll address those motions together. I draw the following facts from the parties' proposed findings of fact, Taylor's administrative grievance record, and Taylor's deposition testimony. The facts are undisputed unless otherwise noted.

Plaintiff Corey Taylor was incarcerated at the La Crosse County Jail between March 17 and August 10, 2019. Defendant Mike Thompson was a sergeant at the jail.

3

### 1.  Lockouts

The jail had a "lockout" policy that prohibited inmates from entering their cells between 8:00 a.m. and 1:00 p.m. each day. Instead, inmates spent this time in the dayroom, which did not have cushioned chairs or other surfaces to sit or lie on. Blankets and pillows are not allowed in the dayroom.

Taylor suffers from painful internal hemorrhoids. Sitting or lying on hard surfaces inflamed Taylor's hemorrhoids and caused them to bleed, causing him severe pain. When Taylor asked if he could bring a pillow or towel out of his cell to use as a cushion, officers told him that he could not and that he should speak to medical staff.

Inmates may contact medical staff using an electronic kiosk or "sick call" forms. Medical staff also routinely walked through units on medication pass, and Taylor says that inmates could tell correctional officers about a medical problem and they would call a nurse. Taylor says that his hemorrhoid condition was already placed in his medical file when he was initially booked. Taylor says that he had verbal discussions with nurses, who suggested that they would have him see a doctor for his hemorrhoids, but no appointment was ever scheduled. Taylor received medical care for other conditions, including a broken finger and dry skin. Taylor used the kiosk system to request medical help for other conditions, but not for his hemorrhoids. Nor did he file an administrative grievance about a lack of medical care for his hemorrhoids.

In April 2019, Taylor submitted administrative grievance No. 370994 about the lockout policy. Dkt. 31-3. But his grievance was not about how the lockouts inflamed his hemorrhoids. Rather, he contended that he was being placed in danger of harm by other inmates by having them all share the dayroom. Defendant Thompson rejected the grievance,

stating that "[j]ail rules are not grievable." *Id.* Taylor appealed that ruling, with the reviewing official denying it. *Id.* at 2.

### 2.  Communications

Inmates at the jail are allowed to send mail out of the jail. But they may receive physical mail from only certain types of senders: courts, lawyers, other government officials, and other correctional facilities. Friends and family of inmates are not allowed to send physical mail to inmates. Instead, they must use an "e-messaging" system, charging a fee (Taylor likened it to the price of a stamp) to send a short text message to an inmate. Inmates can read their messages at a monitor devoted to that purpose or, in certain units, officers will print out the messages and provide them to inmates. Friends and family remained free to visit inmates or communicate by telephone. Defendants submit a copy of the jail's general mail policy, Dkt. 55-4, which does not address the contours of the electronic messaging system. Neither side submits a copy of a policy directly about the electronic system, so it's unclear whether that policy was adopted in a formal written document.

Defendants say that the jail adopted its mail restriction because of multiple instances of drugs being smuggled in, leading to several inmate overdoses. Family and friends of inmates were able to send drugs through the mail by applying liquid forms of the drugs to the paper, or by hiding difficult-to-see suboxone film in mail. Screening incoming mail for this type of smuggling would require significant additional time and effort.

On April 9, 2019, the jail rejected a letter and money order sent to Taylor by his grandmother. Money orders are ordinarily not subject to the incoming mail restriction. Taylor filed a grievance about the money order being returned. But Taylor withdrew his grievance after a sergeant assured him that money orders would be accepted in the future. For the most

5

part, Taylor was able to receive money orders, but he says that there was one other incident in which a money order was mistakenly intercepted.

On May 21, 2019, Taylor filed a "general request" in the kiosk system, asking to be allowed to receive letters from his grandmother, in part because she "does not have the access to the technology to emessage me and if she did she wouldn't know how to use it." Dkt. 55-3, at 85. According to Taylor, his grandmother was 88 or 89 years old at the time. Defendant Thompson denied his request, stating that if Taylor was granted an exemption, officials would have to grant an exemption for every inmate who asked. Thompson also says that he lacked the authority to grant an exemption to the electronic messaging system; only the jail captain could grant exemptions.

By the time of Taylor's request, another inmate, Raymond Bolestad, who is white, had received an exemption from the mail restriction for his mother, who was elderly and had "significant difficulty" using the electronic system. Dkt. 55 at 3, ¶ 11. On June 26, 2019, Taylor filed a grievance about his friends and family being forced to use the electronic message system rather than the U.S. Mail, mentioning his grandmother in particular. Defendant Thompson responded later that day, denying the grievance, but stating in part, "Your grandmother can write. You need to request through Captain Verse."  Dkt. 55-2, at 17. Taylor appealed to Captain Verse, and on July 1, Verse responded as follows:

> I apologize that your request in which your grandmother be able to write you was denied. At the time this request was denied, there was not a jail captain, as the position was vacant. I also apologize if you are getting mixed messages from staff and sergeants. The emessaging system is still in its infancy stage, but I will make sure all staff are on the same page in the future.
>
> Please write me your grandmother's name and her address, so that we will know how to identify mail that comes from her. Your mail

6

> will be photo copied, and delivered to you. The original letter, will
> be placed into your property bin.

*Id.* at 21.

The court will discuss additional facts as they become relevant to the analysis.


## ANALYSIS

Taylor brings the following claims:

- Defendant La Crosse County violated the Fourteenth Amendment by adopting a lockout policy that exacerbated Taylor's pain caused by his internal hemorrhoids.

- Defendant Thompson violated the Fourteenth Amendment by rejecting Taylor's grievance about the pain that the lockout policy caused him.

- Thompson violated Thompson's right to equal protection of the law under the Fourteenth Amendment by rejecting the grievance based on Taylor's race.

- La Crosse County policies violated Taylor's First Amendment rights by preventing him from communicating with his grandmother.

- Thompson violated Taylor's First Amendment rights by refusing to grant Taylor an exception to the communications policy.

- Thompson violated Thompson's right to equal protection of the law under the Fourteenth Amendment by refusing to grant Taylor an exception because of his race.

**A.  Lockouts**

**1.  Claim against La Crosse County**

Defendants have filed an exhaustion-based motion for summary judgment on Taylor's claims related to the lockout policy forcing him to sit on hard surfaces that exacerbated the pain from his internal hemorrhoids. I'll start by addressing the exhaustion motion as it pertains to Taylor's claim against the county under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691

(1978) (claim may be brought against municipality if deprivation caused by county policy or custom or performed by an official with final policymaking authority).

The Prison Litigation Reform Act requires inmates to exhaust all available administrative remedies before filing a lawsuit in federal court about prison conditions. 42 U.S.C. § 1997e(a). To comply with § 1997e(a), a prisoner must take each step in the administrative process, *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002), which includes following instructions for filing an initial grievance, *Cannon v. Washington*, 418 F.3d 714, 718 (7th Cir. 2005), as well as filing all necessary appeals, *Burrell v. Powers*, 431 F.3d 282, 284–85 (7th Cir. 2005), "in the place, and at the time, the prison's administrative rules require," *Pozo*, 286 F.3d at 1025. The purpose of these requirements is to give jail administrators a fair opportunity to resolve the grievance without litigation. *Woodford v. Ngo*, 548 U.S. 81, 88–89 (2006). Failure to exhaust administrative remedies under § 1997e(a) is an affirmative defense that must be proven by the defendants. *Davis v. Mason*, 881 F.3d 982, 985 (7th Cir. 2018).

To exhaust administrative remedies at the La Crosse County Jail, inmates should attempt to informally resolve the issue first and then fill out a grievance form. Dkt. 31-1, at 1. Inmates ordinarily use a digital kiosk to submit a grievance, but if they don't have access to the kiosk they may use a paper form. *Id.* The policy also restricts what type of problems may be considered in a grievance: inmates may file a grievance about "conditions of confinement, which includes release date, housing, medical care, food services, hygiene and sanitation needs, recreation opportunities, classification actions, disciplinary actions, program participation, telephone and mail use procedures, visiting procedures and allegations of sexual abuse." *Id.*

Staff will not accept grievances "if they are challenging the rules and policies themselves, state or local laws, court decisions and probation/parole actions." *Id.*

Defendants contend that Taylor filed one grievance about the lockout policy, No. 370994, *see* Dkt. 31-3, but that it did not exhaust his *Monell* claim about the exacerbation of his hemorrhoid pain, because the grievance wasn't about that problem. Instead, Taylor alleged that the lockout policy placed him at a risk of harm from being placed directly with other inmates. *Id.* at 1. Defendant Thompson rejected the grievance as non-grievable, and the reviewing official denied his appeal.

I agree with defendants that this grievance didn't exhaust Taylor's claim about how the lockout policy exacerbated his medical problem. Taylor isn't required to articulate each legal theory in his grievance, but he does need to "alert[ ] the prison to the nature of the wrong for which redress is sought." *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002). This grievance did not alert prison officials to the type of harm (exacerbation of his medical problem) forming the basis for his claims about the lockout policy.

Nonetheless, defendants' exhaustion argument fails because of the terms of the jail's exhaustion policy: it forbid inmates from grieving challenges to rules or policies. And that was the specific basis on which defendant Thompson rejected Taylor's grievance. In his sur-reply, Taylor cites *Lieberman v. Portage County*, No. 18-cv-450-jdp, 2019 WL 2646580 (W.D. Wis. June 27, 2019), seemingly in an attempt to argue that the county can't establish an exhaustion requirement that conflicts with § 1997e(a). My decision in *Lieberman* doesn't stand for that proposition, but I did state that "[a]n inmate is not required to grieve an issue that the facility's own rules say is outside the scope of the grievance procedure." 2019 WL 2646580, at *2 (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007) ("[T]o properly exhaust administrative remedies

prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." (internal citations and quotation marks omitted)); *Thomas v. Reese*, 787 F.3d 845, 848 (7th Cir. 2015) (administrative remedies "were not actually available" to inmate who was forbidden by grievance policy from raising his specific type of claim in either the grievance or disciplinary processes)). If Taylor was forbidden from filing a grievance about the lockout policy, then it doesn't matter whether the grievance he actually filed put defendants on notice of his claims.

Jail officials' handling of Taylor's grievance No. 370994 shows that they wouldn't have considered a grievance about how the policy harmed him. Thompson rejected Taylor's grievance about his safety as a non-grievable challenge to the lockout policy. The official reviewing Taylor's appeal suggested that Taylor was correct that he could grieve conditions of his confinement, but the reviewer nonetheless denied the appeal without addressing Taylor's substantive safety concerns caused by the policy. There isn't a reasonable inference to be drawn that Thompson or the reviewer would have addressed a grievance about medical harm caused by the policy any differently; they would have instead focused on Taylor's complaint about the non-grievable policy. I conclude that the county did not make administrative remedies available to inmates for claims about harm caused by prison policies. I will deny defendants' exhaustion-based summary judgment motion on the *Monell* claim against the county.

Defendants have also moved for summary judgment on the substance of Taylor's claims. Rather than the Eighth Amendment's prohibition on cruel and unusual punishment for convicted prisoners, the Fourteenth Amendment prohibits any type of punishment against pretrial detainees, which was Taylor's status at the jail. *See Youngberg v. Romeo*, 457 U.S. 307,

320 (1982); *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law"). To prevail on a claim based on a medical problem such as Taylor's internal hemorrhoids, a plaintiff needs to show that he suffered from a serious medical need and that the defendant acted in an objectively unreasonable way toward that problem. *See Miranda v. Cty. of Lake*, 900 F.3d 335, 350–53 (7th Cir. 2018). The parties do not dispute that Taylor had a serious medical need.

To prevail a *Monell* claim against the county, Taylor must also show that "the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Board of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404 (1997). In the Eighth Amendment context, a municipality may be liable when it is "deliberately indifferent to the risk that its polices (or a gap in them) would cause a constitutional violation." *Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020). So in the Fourteenth Amendment context, Taylor needs to show that the county acted in an objectively unreasonable way toward the risk of harm to prisoners like Taylor.

Taylor fails to show that the lockout policy unreasonably addressed the risk to inmates with medical problems. On its face, there nothing obviously dangerous about a policy forcing inmates into the dayroom for several hours at a time, although one might assume that lockouts could adversely affect inmates who for medical reasons would be uncomfortable in the dayroom. But the county had other policies meant to address this type of problem: Taylor was free to seek medical assistance for his problem. He admits that correctional staff told him that this was the way to solve the problem, because he could not bring out a pillow or towel to use as a cushion without the approval of medical staff.

11

Yet Taylor did little to have medical staff address the pain caused by the lockouts, even though he saw medical staff for other problems, including a broken finger and dry skin. He did not make a formal medical appointment over the kiosk system. He says that nurses told him that they would make an appointment to see a doctor and apparently did not follow through. But Taylor isn't bringing a claim against the nurses for ignoring his problem. There's no indication that medical staff routinely disregarded prisoners' medical needs so that I should consider the lack of medical care to be an additional policy or custom as part of Taylor's *Monell* claim. Given the availability of medical care or accommodations for prisoners who were harmed by the lockout policy, no reasonable jury could conclude that the county's adoption of a lockout policy was objectively unreasonable.

### 2. Claim against Sergeant Thompson

Taylor contends that defendant Thompson ignored his medical problem and racially discriminated against him when he rejected a grievance about the lockout policy exacerbating the pain from his hemorrhoids. Defendants contend that Taylor didn't exhaust his administrative grievances for these claims. I'm not convinced that the grievance system was available for these claims either because they were still rooted in the lockout policy, which jail staff considered non-grievable.

Taylor's medical-care claim fails for a more fundamental substantive reason: the undisputed facts contradict Taylor's original allegation about Thompson rejecting a grievance about the lockouts affecting his hemorrhoids. The record shows that Taylor didn't file a grievance about lockouts affecting his hemorrhoids; Taylor's only lockout-based grievance was about him being placed in danger at the hands of other inmates, not about his health problems.

Because Thompson was not presented with a grievance about Taylor's health problems, I will grant summary judgment to defendants on that claim.

That would also be enough to dismiss Taylor's equal protection claim against Thompson, because that claim was also premised on Taylor's allegation that Thompson discriminated against him in handling a grievance about how the lockout affected Taylor's hemorrhoids. But even had Taylor's equal protection claim been a more general one about Thompson's response to *any* grievance that Taylor filed about the lockout policy, Thompson would still be entitled to summary judgment. To succeed on this type of equal protection claim, a plaintiff must show that (1) he is a member of a protected class; (2) he was similarly situated to members of the unprotected class; (3) and he was treated differently from members of the unprotected class. *See Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005). A plaintiff must also produce evidence of discriminatory intent—that is, evidence that defendants "selected a particular course of action at least in part because of its adverse effects upon an identifiable group." *Alston v. City of Madison*, 853 F.3d 901, 907 (7th Cir. 2017) (citation and quotation marks omitted).

Taylor fails to show that he was treated differently from other inmates: in his deposition, he admits that he was unaware of other inmates being treated differently by getting individual exemptions to the lockout policy. *See* Dkt. 53, at 77–78. Taylor also fails to show that Thompson acted with discriminatory animus toward him in rejecting the one lockout-based grievance he did file. At his deposition, Taylor supported his contention that Thompson discriminated against him by saying that Thompson was rude to him and other Black inmates:

> I look at it more of a discriminatory way because of the simple fact that he was rude towards me. . . . He wasn't just rude towards me, he was rude towards a lot of African-American guys. But when

13

> a person of Caucasian descent come to him for something, he's
> more respectful.

*Id.* at 79. But this vague sort of discourtesy isn't enough to support an equal protection claim. *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) ("Standing alone, simple verbal harassment does not . . . deny a prisoner equal protection of the laws."). He also says that Thompson discriminated against him in an unrelated incident, by failing to give him an exemption to the prison physical-mail restriction even though a white inmate received a similar exemption. But as I discuss below in more detail with regard Taylor's mail-policy claim, Taylor does not provide evidence that shows that Thompson was responsible for the white inmate's communication-policy exemption, so he didn't treat similarly situated inmates any differently. Without any evidence that could support a race discrimination claim regarding the lockout, I will grant summary judgment to defendants on that claim.

**B. Communication policies**

Taylor contends that La Crosse County policies and defendant Thompson violated his First Amendment rights by preventing him from communicating with his grandmother. Taylor also contends that Thompson racially discriminated against him by rejecting his request for an exemption from the mail restriction policy for his grandmother. Defendants do not move for summary judgment on exhaustion grounds with respect to these claims, so I will proceed directly to the substance of Taylor's claims.

**1. First Amendment claims**

Taylor's First Amendment claim against the county is a *Monell* claim based on the jail policy barring his grandmother from sending him physical mail. I also granted Taylor leave to proceed on a First Amendment claim against defendant Sergeant Thompson under the theory

14

that Thompson could have granted him an exception from the mail-restriction policy but did not.

The First Amendment's guarantee of freedom of speech provides protection from censorship of a prisoner's incoming and outgoing correspondence. *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999) (citing *Turner v. Safley*, 482 U.S. 78 (1987); *Thornburgh v. Abbott*, 490 U.S. 401 (1989)). A facility's restriction on an inmate's speech will be upheld if it is reasonably related to a legitimate penological interest. *Turner*, 482 U.S. at 89. In determining whether a reasonable relationship exists, the Supreme Court usually considers four factors: (1) whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest; (2) whether the prisoner retains alternatives for exercising the right; (3) what impact accommodation of the right will have on jail administration; and (4) whether there are other ways that jail officials can achieve the same goals without encroaching on the right. *See id.*, 89–91.

In evaluating whether there is a valid, rational connection between a restriction and the government's legitimate penological interests, the initial burden of proof rests on the defendant government officials. *Singer v. Raemisch*, 593 F.3d 529, 536–37 (7th Cir. 2010). *Id.* at 536–37. Once the defendants offer a "plausible explanation" for the restriction, the burden shifts to the plaintiff to present evidence undermining the state officials' explanation. *Id.*

Defendants provide a plausible, rational reason for limiting physical mail and shifting to an electronic mail system: the threat of hard-to-detect drugs being smuggled in physical mail. The court generally defers to prison officials on matters of prison security. *See, e.g.*, *Thornburgh*, 490 U.S. at 408 ("Courts must "afford[ ] considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners

15

and the outside world."). In his deposition, Taylor suggests that the jail implemented the policy because of problems at other facilities, not the La Crosse County Jail, but he doesn't dispute that there is a plausible reason for jail staff to be concerned about drugs being smuggled in incoming mail.

The remaining elements of the *Turner* analysis touch on how the policies or alternatives to those policies practically affect prisoners' rights and administration of the facility. I note that other jurisdictions have made similar efforts to bar mail being sent directly to inmates. *Thompson v. Ferguson*, 2020 WL 7872629, at *2 (E.D. Pa. Dec. 31, 2020) (discussing Pennsylvania's system for scanning non-legal inmate mail instead of sending directly to inmates); *Strebe v. Kanode*, 2018 WL 4473117 (W.D. Va. Sept. 18, 2018), *aff'd*, 783 F. App'x 285 (4th Cir. 2019) (upholding Virginia's correspondence policy providing inmates with electronic copies or photocopies of incoming mail to prevent drug smuggling). On the face of it, the La Crosse County restriction is more onerous than the restrictions in those states: in Pennsylvania or Virginia, an inmate's friends or family still send physical mail, but that mail is scanned and the inmate is provided with an electronic copy or a photocopy. In La Crosse County, friends and family generally cannot send physical mail whatsoever.

But Taylor's claims are not about the general application of the electronic messaging policy and he has not presented evidence at summary judgment that would give me reason to rule that the entire incoming mail policy is unconstitutional. Taylor's claims are about how the policies affected his correspondence with his grandmother. And those claims do not boil down to the question whether electronic messages are an acceptable alternative to physical mail. Although the electronic messages were clearly an unacceptable alternative for Taylor's grandmother—who was unable to use the electronic system, either because she didn't have a

16

device capable of sending the electronic messages or she didn't have the technological savvy to do so—jail staff allowed exemptions to the incoming mail ban.  So at least in theory Taylor retained the ability to receive physical mail from his grandmother. Under *Turner*, the substantial gains to prison administration in avoiding the burden of inspecting each piece of physical mail were balanced against only the small burden on Taylor to obtain an exemption. The parties don't explain under what circumstances inmates would qualify for an exemption, but Taylor knew that he could ask for an exemption, he knew that inmate Bolestad had received an exemption for his mother because of her inability to use the system, and Taylor indeed eventually received an exemption for his grandmother.

What really blocked Taylor's ability to correspond with his grandmother was Thompson's initial refusal to grant him an exemption: Thompson rejected a May 2019 kiosk request for an exemption from the mail bar and Taylor says that Thompson did nothing when he verbally discussed the mail issue with him. Defendants explain that Thompson didn't have the power to grant an exemption himself—only the jail captain could.

But this authority argument doesn't in itself foreclose Taylor's claims. Thompson could still have acted to place Taylor's request in the hands of the jail captain, or at least told Taylor how to go about making a direct request to someone who had the authority to make that decision (it appears that the captain's position was vacant at that time)—which is what Thompson did about five weeks later, when he responded to Taylor's grievance by telling him that he could get an exemption for his grandmother by writing to the captain.

The problem for Taylor is that the delay in receiving an exemption wasn't caused by the policy itself; it was the result of defendant Thompson's negligence. In denying Taylor's May 2019 kiosk request, Thompson says that he did not believe that Taylor qualified for an

17

exemption similar to any that the captain had previously allowed. That was incorrect: inmate Bolestad had received a similar exemption for his mother. Negligence cannot be the basis for liability on constitutional claims like Taylor's brought under 42 U.S.C. § 1983. *Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Zarnes v. Rhodes*, 64 F.3d 285, 290 (7th Cir. 1995). And Taylor has adduced no evidence that Thompson intentionally violated his rights.

Alternatively, regardless of Thompson's initial denial, Taylor's First Amendment claims fail because Taylor ultimately received the exemption for his grandmother, so any harm to him was minor and short-lived. "[S]hort-term and sporadic" delays in receiving mail are not actionable under the First Amendment. *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999); *see also Schroeder v. Drankiewicz*, 519 F. App'x 947, 950 (7th Cir. 2013) ("delay of less than two months in sending a single piece of personal mail . . . was not an injury of constitutional dimension"); *Ahlers v. Rabinowitz*, 684 F.3d 53, 64–65 (2d Cir. 2012) (eleven instances of delayed or withheld mail over four months did not state First Amendment claim). Taylor went only a few months without mail from his grandmother, with evidence of only one letter and two money orders being blocked or delayed, which is not enough to sustain a First Amendment claim.

### 2.  Equal protection claim

Taylor also brings a Fourteenth Amendment equal protection claim against Thompson, contending that Thompson racially discriminated against him by denying his request for an exemption to the ban on incoming mail while granting an identical request from a white detainee. The undisputed facts show that Thompson couldn't officially grant or deny this type of request, although Thompson did have some personal involvement the matter; he rejected Taylor's May kiosk request without passing it on to the captain and he responded to Taylor's

June grievance by telling him to write to the captain. In any event, Taylor fails to show that Thompson treated his requests any differently than any other inmate's. Although Taylor says that a white inmate, Raymond Bolestad, received an exemption from the paper-mail bar to receive mail from his mother, he fails to show that Thompson had any role in the granting of that exemption. Taylor does say that at one point Thompson was receptive to a question that Bolestad asked him, but Taylor did not remember whether this discussion was about the communications policy:

> A  . . . I forgot what the situation was. We was coming back from class, and [Bolestad] stopped [Thompson] in the hallway and asked him a question. And he was, like, oh, I'll look into that for you.
>
> Q  What was the question?
>
> A  I'm not -- I cannot recall.

Dkt. 53, at 82. Taylor believes that Thompson's willingness to assist Bolestad with an unidentified matter, along with Thompsons general rudeness and unwillingness to help Black inmates, shows that Thompson was racist and that Thompson discriminated against him with regard to his request for a communications exemption. But as I stated above, simple rude behavior is not enough to violate the Equal Protection Clause. And Taylor's vague statements about Thompson's actions do not show that he treated similar requests by Taylor and Bolestad any differently, nor do they show that Thompson acted with discriminatory animus toward Taylor in denying his request. The evidence also shows that Thompson helped Taylor about a month later by telling him to contact the captain for an exemption, which undercuts the theory that Thompson held any animus toward him. Because Taylor fails to provide evidence that

19

could lead a reasonable jury to find in his favor on his equal protection claim against Thompson, I will grant defendants' substantive motion for summary judgment on that claim.[1]

## ORDER

IT IS ORDERED that:

1. Plaintiff Corey Taylor's motion for leave to file a sur-reply, Dkt. 41, is GRANTED.

2. Plaintiff's motions for law library access, Dkt. 36 and Dkt. 45, are DENIED.

3. Plaintiff's renewed motion for the court's assistance in recruiting him counsel, Dkt. 58, is DENIED.

4. Defendants' motion to compel authorization of plaintiff's medical records, Dkt. 59, is DENIED as moot.

5. Defendants' motion for summary judgment on exhaustion grounds, Dkt. 28, is DENIED.

6. Defendants' motion for summary judgment on substantive grounds, Dkt. 48, is GRANTED.

7. The clerk of court is directed to enter judgment accordingly and close the case.

Entered January 22, 2021.

BY THE COURT

/s/

_____

JAMES D. PETERSON
District Judge

---

[1] Defendant Thompson also contends that he is entitled to qualified immunity on each of Taylor's claims against him. Because I am dismissing Taylor's claims against Thompson on substantive grounds, I need not consider Thompson's qualified immunity argument.